**Berniece LARIMORE, Sam M. Taylor, William G. Butcher, and Orville Bottrell, Petitioners,**

v.

**COMPTROLLER OF the CURRENCY,\* Respondent.**

**Nos. 84–1971, 84–1972, 84–1973 and 84–1974.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 5, 1986.

Decided April 30, 1986.

As Amended May 5, 1986.

---

\* During the pendency of this appeal Robert Clarke replaced C.T. Conover as Comptroller of the Currency.

COFFEY, Circuit Judge.

In *Larimore v. Conover*, 775 F.2d 890 (7th Cir.1985), a panel of this court approved an order of the Comptroller of the Currency requiring the directors of the First National Bank of Mt. Auburn, Illinois ("Bank") to reimburse the Bank for losses resulting from the director's approval of loans in excess of the legal lending limit contained in 12 U.S.C. § 84. The Comptroller of the Currency brought this action pursuant to the cease and desist provision contained in 12 U.S.C. § 1818(b)(1). We granted the petitioner's request for rehearing *in banc* to address the issue of whether 12 U.S.C. § 1818(b)(1) gives the Comptroller of the Currency the authority to order an individual director of a nationally chartered bank to personally indemnify the bank for losses resulting from his participation in violating 12 U.S.C. § 84. While no specific case law has addressed whether the Comptroller has the authority to impose personal liability, our review of the relevant statutes, 12 U.S.C. §§ 93(a), 1818(b)(1), and their legislative history reveal that the Comptroller has no such authority, and thus we vacate the order of the Comptroller and dismiss this action.

## I

The record reveals that in late 1979 and continuing into 1980 the First National Bank of Auburn board of directors approved loans to Porter Construction and Twin County Trucking Companies in excess of the statutory limit. Title 12 U.S.C. § 84 provided that: "The total obligations to any national banking association of any person, copartnership, association, or corporation shall at no time exceed 10 per centum of the amount of capital stock of such association actually paid in and unimpaired and 10 per centum of its unimpaired surplus fund." [1]  An OCC audit of the Bank in

Ronald W. Periard, Hershey, Bliss, Beavers, Periard & Romano, Taylorville, Ill., Robert G. Heckenkamp, Heckenkamp & Simhauser, Springfield, Ill., for petitioners.

Ellen Broadman, Washington, D.C., for respondent.

Before CUMMINGS, Chief Judge, BAUER, WOOD, CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, and RIPPLE, Circuit Judges.

---

1. Thus, at the time the loans were made, 12 U.S.C. § 84(a)(1) provided that the legal lending limit for a line of credit to any one customer of the bank could not exceed 10% of the bank's equity; the only change to 12 U.S.C. § 84(a)(1)

occurred in 1982 when the limit was increased to 15%. Section 84 of Title 12 in part provides:
"(a) Total loans and extensions of credit
(1) The total loans and extensions of credit by a national banking association to a person

September 1980 revealed loans in excess of the statutory limit to the Porter Construction and Twin County Companies. In its report to the Bank, the Office of the Comptroller of the Currency ("OCC") admonished the directors that its lending procedures were improper, ineffective and in need of immediate revision, stating, "It is necessary that directors exercise more effective supervision over the loan area." In addition, the September 1980 report reviewing the Bank's operations reflected that the OCC advised the directors that they faced potential personal liability for granting loans in excess of the statutory lending limit. Subsequently, the Bank after receiving payments from the Porter Construction and the Twin County Trucking Company on their outstanding loans, reduced their respective lines of credit to comply with the ten percent lending limit. Shortly thereafter, in July 1981, the board of directors once again approved loans to Porter and Twin County Trucking Company in excess of the prescribed ten percent limit.

One-half year later, on January 7, 1982, the appellant Butcher joined the Bank's board of directors. Subsequent to this date, with Butcher present, the board once again approved additional loans to Porter Construction and the Twin County Trucking Company as well as additional loans to three other individuals in excess of the statutory lending limits. The minutes of the Bank's board meeting of March 4, 1982, indicated some concern on the part of certain members of the Board regarding the outstanding Porter Construction loan.

The OCC returned to the Bank on July 26, 1982, conducted another audit, and again discovered that Porter Construction, and the Twin County Trucking Company together with certain other bank customers' lines of credit exceeded the proper legal lending limits. On November 9, 1982, the OCC served the Bank board of directors with notice of a violation of 12 U.S.C. § 84 in granting loans in excess of the statutory limits and commenced administrative proceedings pursuant to 12 U.S.C. § 1818(b)(1) to obtain a cease and desist order against the Bank and its directors.[2] Section 1818(b)(1) of Title 12 provides:

"(b)(1) If, in the opinion of the appropriate Federal banking agency, any insured bank ... or any director, officer, employee, agent, or other person participating in the conduct of the affairs of such a bank is engaging or has engaged, or the agency has reasonable cause to believe that the bank or any directors ... or other person participating in the conduct of the affairs of such bank ... is violating or has violated ... a law, rule, or regulation ... the agency may issue and serve upon the bank or such director ... a notice of charges in respect thereof...."

\* \* \* \* \* \*

In the event ... the agency shall find that any violation ... specified in the notice of charges has been established, the agency may issue ... an order to cease and desist from any such violation or practice. Such order may ... require the bank or its directors ... to cease and desist from the same, *and, further, to take affirmative action to correct the conditions resulting from any such violation or practice.*" (Emphasis added.)

After the administrative law judge ("ALJ") hearing the case determined that the directors had approved loans in excess of the statutory limit, the OCC requested the ALJ to assess personal liability and damages against each director for the losses arising from these loans in excess of the statutory

outstanding at one time and not fully secured, as determined in a manner consistent with paragraph (2) of this subsection, by collateral having a market value at least equal to the amount of the loan or extension of credit shall not exceed 15 per centum of the unimpaired capital and unimpaired surplus of the association.

**2.** The Bank and the Comptroller subsequently stipulated to all issues contained in the Notice of Charges, except those involving the assessment of personal liability against the bank directors for the lending limit violations.

limits.[3] The ALJ agreed with the OCC's position and imposed personal liability upon each of the bank directors, except for Butcher. The ALJ ruled that the directors "knew or should have known that they were approving extensions of credit in violation of Section 84...." The ALJ found, however, that Butcher "did not know, nor ... have reason to know, that he was approving loans in violation of Section 84." The ALJ reasoned that:

"Respondent Butcher became a member of the BOARD on January 7, 1982. He had no prior experience as a bank director. At no time before the commencement of the Bank examination on July 26, 1982, was he informed of the total amount of the line of credit extended to any borrower from the BANK. Moreover, he was not aware of the October 1980 Report of Examination before July 1982.

\* \* \* \* \* \*

... [T]he record does not show that respondent Butcher was put on notice to make inquiry into the facts surrounding the approval of loans by the BOARD." (Emphasis in original).

Upon return of the case to the OCC, the Comptroller disagreed with the ALJ's decision regarding the nonassessment of liability and damages against Butcher, and ruled that he (Butcher) should have known that he was approving loans in violation of the legal lending limits in 12 U.S.C. § 84.

"Mr. Butcher was under the same duty to observe the applicable law and to investigate the relevant facts as were the other directors, and he should have known that he was approving loans in violation of 12 U.S.C. § 84. In this respect, it is not a defense that Mr. Butcher was new to the position, or that he was not familiar with the bank's operations."

The Comptroller proceeded to assess personal liability against all the directors and ordered them to indemnify the Bank, "up to their potential liability" for all losses that the Bank incurred or may incur as a result of the excessive loans. The Comptroller imposed joint and several liability and assessed damages in the total amount of $1,084,883 against the directors Bottrell, Larimore, Mulberry and Taylor and $744,053 against Butcher.

Some eighteen months before Butcher joined the board, in September 1980, the OCC warned the present directors of the problem of excessive loans, and also directed the board to "exercise more effective supervision over the loan area." The record reflects that Butcher was not made aware of the warning, much less the directive, until July 1982. Butcher was not placed on notice of the Bank's careless loan procedure until after the OCC's audit in July 1982 revealed that the board had once again approved loans in excess of the statutory limit.

The record sets forth that the bank's lending procedure at the time of the OCC's 1980 examination was for Mr. Bottrell, the Bank president and the chief lending officer, to personally investigate a loan applicant and based on his approval, the loan would be granted, in advance of the board's review. The Bank's procedure also provided that at the next board meeting following the granting of the loan, Bottrell would advise the board of the loans granted and request its approval. At this meeting, he would submit the documentation including the borrower's name, date, amount of the loan, and the interest rate. However, the data given to the board failed to reveal the vital information as to the amount of loans

3. Title 12 U.S.C. § 1818(h)(1) states that any hearing provided for in section 1818 shall be conducted in "accordance with the provisions of chapter 5 of Title 5." Title 5 U.S.C. § 556(b)(3) provides for the appointment of an administrative law judge. In this case, although the record is unclear on this point, the Comptroller apparently requested that an ALJ be appointed to hear this matter. The ALJ's decision was then reviewed by the Comptroller, pursuant to 12 C.F.R. §§ 19.12–19.14 (1985), providing that after the hearing has been conducted and the finding of facts and conclusions of law entered the case is "submitted to the Comptroller for final decision." *See also* 5 U.S.C. § 557; 12 U.S.C. § 1818(b)(1).

then outstanding to the particular individual, much less the maximum amount the bank was permitted to lend to a particular borrower pursuant to 12 U.S.C. § 84. Thus, the board entrusted Bottrell, the bank's chief lending officer, totally with the responsibility of ensuring the Bank's compliance with the applicable lending limits. The board, for reasons undisclosed in the record, either failed or refused to revise the loan procedure even after the OCC's 1980 warning and directive regarding the excessive loans and the order to "exercise more effective supervision" to avoid potential personal liability. Consequently, this procedure for reviewing loan applications remained unchanged and was still operative when Butcher joined the board in January of 1982. As a result of the lack of communication between the Bank directors, either intentional or through negligence, Butcher was never informed that the total amount of loans outstanding to Porter Construction and the Twin County Trucking Company were above the current lending limit under 12 U.S.C. § 84 at the time of the granting of the additional loans.

The appellants petitioned this court to review the decision of the Comptroller pursuant to 12 U.S.C. § 1818(b)(2), (i)(2)(IV). A panel of this court (with Judge Coffey dissenting) affirmed the Order of the Comptroller, but the panel failed to address the initial issue of whether the Comptroller, pursuant to § 1818(b)(1), had the authority to order the directors to indemnify the bank for potential losses arising from their approval of loans in excess of the statutory limit contained in 12 U.S.C. § 84.

The issue before this court is whether the Comptroller has the authority to unilaterally impose personal liability against a bank director under 12 U.S.C. § 1818(b)(1) without instituting an action to seek damages from a director in the "proper district or territorial court," as required by 12 U.S.C. § 93.

## II

We recognize that we must accord due deference to an agency's interpretation of its authorizing statute, *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–845, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984), and that an agency's interpretation of its authorizing statute need not be the only permissible one in order for it to be sustained. *Id.* at 844, 104 S.Ct. at 2782. However, the deference accorded an administrative agency's construction of the authorizing legislation has limitations and certainly must not be interpreted to allow an agency the broad and unbridled authority to decide the limits or boundaries of its own authority. *See Social Security Board v. Nierotko,* 327 U.S. 358, 369, 66 S.Ct. 637, 643, 90 L.Ed. 718 (1946); *Citizens State Bank of Marshfield, Mo. v. FDIC,* 751 F.2d 209, 217 (7th Cir.1984); *see also Board of Governors of Federal Reserve System v. Dimension Financial Corp.,* — U.S. —, —, 106 S.Ct. 681, 685, 88 L.Ed.2d 691 (1986). In this case, we must decide whether Congress intended that the Comptroller have the sole authority and unbridled power to assess personal liability against bank directors, pursuant to the cease and desist provision in 12 U.S.C. § 1818(b)(1), for approving loans to customers of the bank in excess of the statutory lending limits contained in 12 U.S.C. § 84.

We begin our analysis with Title 12 U.S.C. § 93(a) that provides:

"If the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the provisions of this chapter, all the rights, privileges, and franchises of the association shall be thereby forfeited. *Such violation shall, however, be determined and adjudged by a proper district or Territorial court of the United States* in a suit brought for that purpose by the Comptroller of the Currency, in his own name, before the association shall be declared dissolved. And *in cases of such violation, every director who participated in or assented to the same shall be held liable in his personal and individual capacity for*

*all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation."*

12 U.S.C. § 93(a) (originally enacted as Act June 3, 1864, ch. 106, § 53) (emphasis added). The Act of June 3, 1864 gave the Comptroller of the Currency the authority to file a lawsuit in Federal district court against a bank director in his individual capacity for damages resulting from his knowing violation of the legal lending limits in 12 U.S.C. § 84 and other banking laws. Although the action of the Comptroller in the case before us is technically labeled as an order to indemnify, it has the effect of an enforceable personal judgment against a director for damages sustained by the bank. Thus, the Comptroller in the instant case is adjudicating the Bank directors personally liable for violations of 12 U.S.C. § 84 in an administrative action, without a trial before a court of competent jurisdiction, while section 93 of Title 12 mandates that such liability "shall" be "determined and adjudged by a proper district or territorial court of the United States." [4]

The Comptroller, however, argues that his authority to impose personal liability upon bank directors is derived from 12 U.S.C. § 1818(b)(1) which provides that if the Comptroller finds an "unsafe or unsound" banking practice or a violation of a "law, rule or regulation ...," the Comptroller may issue an order requiring "the bank and its directors, officers, employees, and agents to cease and desist from [any such violation or practice] and, *further to take such affirmative action to correct the conditions resulting from any such violation or practice." Id.* The Comptroller has taken it upon himself to broadly inter-

---

**4.** The Administrative Law Judge stated in his decision that "Section 93 is not a practicable alternative in the circumstances, because that section presupposes the ultimate dissolution of the Bank." While a narrow reading of this statute may support such a position, no case law authority has been presented to us to support this theory; in fact the case law we have discovered interpreting this statute does not support the ALJ's position. For example, in *Cockrill v. Cooper,* 86 F.7 (8th Cir.1898) the court stated:

"Cases may easily be supposed, and have doubtless occurred, where a national bank has sustained damage by reason of excessive loans made with the approval of its board of directors, and yet the losses incident to such wrongful acts were not so great as to impair the bank's capital, and render a forfeiture of its charter either necessary or expedient. It can scarcely be supposed that congress intended to frame a law which in a case of that kind would either compel the comptroller to forfeit the franchises of the corporation, or suffer its directors to escape liability for a plain violation of law; yet such would be the necessary result if the contention in behalf of the appellees is well founded. Without pursuing this branch of the case at greater length, *we shall content ourselves with the statement that the forfeiture of a bank's franchise, in a suit brought by the comptroller for that purpose, is not, in our judgment, a condition precedent to the maintenance of a suit against its directors for excessive loans."*

*Id.* at 13 (emphasis added). *See Seiden v. Butcher,* 443 F.Supp. 384, 385 (S.D.N.Y.1978); *see also Bennett v. Langworthy,* 49 F.2d 574 (8th Cir.

1931); *National Bank of Commerce v. Wade,* 84 F.10 (9th Cir.1897). Furthermore, the Supreme Court in *Corsicana National Bank v. Johnson,* 251 U.S. 68, 40 S.Ct. 82, 64 L.Ed. 141 (1919), noted that a private bank may sue its directors under this statute for losses resulting from the director's actions and the Court specifically stated that: "The fact that in spite of a loss upon this transaction [excessive loan] the Bank remained solvent or even prosperous" is not a defense to an action under § 5239. *Id.* at 83–84, 40 S.Ct. at 89. Both *Cockrill* and *Corsicana* require the institution of a lawsuit to recover money damages from directors pursuant to § 5239, Rev.Stats.—the predecessor of 12 U.S.C. § 93. The language of § 5239, interpreted by the Supreme Court in the *Corsicana* decision, remains intact and unaltered except for the renumbering of the statute from § 5239 to 12 U.S.C. § 93. Thus, *Corsicana* and *Cockrill* establish that a Bank's charter need not be revoked prior to commencing an action under 12 U.S.C. § 93(a). Indeed, it would be anomalous if a bank were allowed to bring an action under section 93 against the bank directors only to be forced to liquidate itself. Although we need not reach the question of whether the Comptroller would be required to liquidate the bank if he brings a successful action to impose liability under 12 U.S.C. § 93, we note that if a bank, such as the bank in *Corsicana,* need not liquidate itself if it brings a successful action for damages against its directors under section 93, we see no reason why the Comptroller would have to liquidate a bank if he was successful in establishing liability in a district or territorial court under 12 U.S.C. § 93(a).

pret the last clause in 12 U.S.C. § 1818(b)(1) allowing him "to take such affirmative action" as authorization to assess personal liability in any amount up to millions of dollars upon any director who, in the Comptroller's opinion, may have violated 12 U.S.C. § 84 in granting loans in excess of the statutory limit without even so much as a trial before a court of law to determine if the director "knowingly violate[d] or knowingly permit[ted] any officer or agents ..." of the bank to violate the National Banking laws. 12 U.S.C. § 93(a). To support this interpretation he cites a Senate Report to the Financial Institutions Supervisory Act of 1966, P.L. 89-695. This report provides in pertinent part:

> "[I]t is essential that the federal supervisory agencies have the statutory and administrative facility to move quickly and effectively to require adherence to the law and cessation and correction of unsafe or improper practices.... Existing remedies have proven inadequate. On the one hand they may be too severe for many situations, such as taking custody of a institution or terminating its insured status. On the other hand they may be so time consuming and cumbersome that substantial injury occurs to the institution before remedial action is effective.

> \* \* \* \* \* \*

> *Experience has often demonstrated that the remedies now available to the Federal supervisory agencies are not only too drastic for use in many cases, but are also too cumbersome to bring about the prompt correction and promptness is very often vitally important."*

5. Indeed, what could be more drastic than imposing a possible judgment of a million dollars? As will be discussed next, section 1818(b)(1) of Title 12 was intended to give the Comptroller the power to remedy unsound banking practices and place the bank on a sound financial footing in order that it might protect its depositors and stockholders, but does not grant the Comptroller any authority to impose personal liability on directors.

6. In fact, it is interesting to note that when section 1818 was enacted, it provided that the

Senate Rep. No. 1482, *reprinted in* 1966 U.S. Code, Cong. & Ad. News 3532, 3536, 3537 (emphasis added). As noted in the Senate Report, administrative remedies available to the Federal banking authorities in 1966, such as the termination of the insured status of a bank or taking custody of the banking institution to remedy unsound banking practices, were considered, and continue to be considered, in ·many situations too drastic a remedy and involved too lengthy and time-consuming proceedings. *Id.* at 3537.[5] The Senate Committee, after conducting hearings, determined that it was unnecessary to take such drastic steps, as "taking custody of an institution or terminating its insured status," when all that was needed was an order from the federal agency to the bank to cease and desist from certain unsound banking practices or to institute changes in its present operating procedures to remedy or improve existing banking practices. (An example of an unsound banking practice is for directors to allow the lending officer the exclusive authority to approve loans, thus abdicating their own responsibility to make the final judgment on the appropriateness of the loans). Thus, in 1966 Congress enacted section 1818(b) to give the proper federal agency the needed flexibility to deal with the problems facing the bank corporations in a fast-moving and ever-changing financial world (for example today's interstate banking); however, there is no language or indication in the legislative history of section 1818 that can legally, logically or reasonably be interpreted to indicate that Congress intended to give the Comptroller the authority to unilaterally assess personal liability and damages against a bank director.[6] Instead, a proper

federal agencies charged with supervising the banking system could suspend or remove bank directors and officers for violations of the banking laws. 18 U.S.C. § 1818(e) (1966) (amended in 1978). This power, however, was not given to the Comptroller. *Id.* at § 1818(e)(2)(4). Rather, Congress believed that:

> "The problems involved in delegating the vital quasi-judicial function of suspending or removing directors or officers of national banks to a single official—as distinguished from a

reading of the Financial Institutions Supervisory Act of 1966 and its legislative history reveals that when Congress empowered the Comptroller with the authority to issue a cease and desist order to a financial institution, its purpose was only to provide for the immediate cessation and correction of a statutory violation, unsafe banking practices, procedures and policies and furthermore to once again place the bank on a sound financial footing.

In 1978, Congress amended 12 U.S.C. § 1818(b)(1) in a limited fashion to allow the Comptroller to issue a cease and desist order not only to a bank but also to *"any director, officer, employee, agent, or other person participating in the affairs of such bank"* that engages in statutory violations or unsafe banking practices. Financial Institutions Regulatory and Interest Rate Control Act of 1978, Pub.L. 95–630, § 107(a)(1) (1978). This amendment to 12 U.S.C. § 1818(b)(1) did not alter the statute's basic purpose—to provide for the immediate cessation and correction of statutory violations and unsafe banking practices and procedures. The only change made in the 1978 amendment to 12 U.S.C. § 1818(b)(1) was that it now allowed the Comptroller to issue a cease and desist order against a specific director, officer or employee of the bank limited to correcting any of the bank's unsound operating practices and policies. Thus, the simple effect of this amendment was to give the Comptroller the authority to issue an order against a particular director, officer or employee to cease and desist from engaging in unsound or unsafe banking practices or from violating a particular bank law or rule, rather than having to bring an action against the bank itself that experience had shown "has hampered the regulatory bodies from taking timely and effective action in situations where an individual and not the organization was at fault." S.Rep. No.

95–323, 95th Cong., 1st Sess. 6 (1977). For example, the Comptroller is now empowered to order the removal of directors from the bank's board and/or employees of the bank upon a showing of a willful disregard for the safety of the bank (before this amendment, a director could be removed only if the federal banking agency, such as the Federal Deposit Insurance Corporation and the Federal Reserve Board, demonstrated that the director or officer was personally dishonest).[7] 12 U.S.C. § 1818(b)(1), (e)(1); S.Rep. No. 95–323, 95th Cong., 1st Sess. 6–7 (1977). *See Sunshine State Bank v. Federal Deposit Ins. Corp.,* 783 F.2d 1580, 1582 (11th Cir.1986) (concerning FDIC removal of two bank officers for engaging in unsound banking practices.) The legislative history to the 1978 amendments to 12 U.S.C. § 1818, however, has never provided, much less indicated, that the Comptroller has the authority or power to impose personal liability on a bank director and had Congress intended to authorize the Comptroller to impose personal liability, it would have provided this authority in its 1978 amendment. Rather, the 1978 amendment to the statute merely enables the Comptroller to take immediate action against a director, officer or employee of the bank to prevent further deterioration of a troubled financial institution. "Correctly used,....these new powers can effectively enhance the ability of the financial institution regulatory agencies to cure unsafe or unsound situations." Senate Rep. No. 95–323, 95th Cong., 1st Sess. 7 (1977).

Our decision finds further support in the recent decision of the Eighth Circuit in *Citizens State Bank of Marshfield, Mo. v. FDIC,* 751 F.2d 209 (8th Cir.1984). In *Citizens State Bank,* the Citizen Bank petitioned for review of an order of the Federal Deposit Insurance Corporation ("FDIC")

body of men—gave the committee much concern.

\*　\*　\*　\*　\*　\*

The committee came to the conclusion that it would be better to have this difficult and delicate quasi-judicial task entrusted to the

collective judgment of a group of officials rather than to a single official."
S.Rep.No. 1482, 89th Cong., 2d Sess., *reprinted in* [1966] U.S. Code Cong. & Ad. News 3532, 3539–40.

7. *See* U.S.C. 1818(e)(1) (1966) (amended 1978).

finding numerous violations by the bank of the Truth in Lending Act. The FDIC ordered the bank, pursuant to the cease and desist provision in 12 U.S.C. § 1818(b)(1) to reimburse consumers for violations of the Truth in Lending Act, 15 U.S.C. §§ 1601 et seq., 1667 (1982). The Eighth Circuit held that the FDIC lacked the power to require reimbursement. *Citizens State Bank of Marshfield, Mo.*, 751 F.2d at 216–19. In rejecting the FDIC's argument that the reimbursement order was "remedial" within the meaning of the cease and desist provision of section 1818(b)(1), the court stated that "[t]he scope of affirmative remedies available under section 1818 must be determined in the context of the statute which the regulatory agency seeks to enforce." *Id.* at 217. In that case, "[t]he major bar to a finding that Congress intended to authorize administrative enforcement of the Truth in Lending Act through restitution orders is the existence of 15 U.S.C. § 1640 (1982), which grants a private right of action for truth in lending violations." *Id.* Similarly, in the case before us, 12 U.S.C. § 93(a) provides the enforcement mechanism for the imposition of personal liability upon a bank's directors only after a court of competent jurisdiction determines that a director has "knowingly" violated the banking laws. To allow the Comptroller to have the power to assess personal liability and damages against a director without bringing his action in federal court would eviscerate the clear Congressional intent of 12 U.S.C. § 93(a) and "would ... sanction administrative preemption of the statutory enforcement scheme designed by Congress." *Id.; cf. Otero Savings & Loan Ass'n v. Federal Home Loan Bank Board*, 665 F.2d 279, 288 (10th Cir.1981) (noting that 12 U.S.C. § 1730(b), which is identical to 12 U.S.C. § 1818(b)(1), and was enacted by Congress when it passed the Financial Supervisory Act of 1966, "only permits the Bank board to insure that institutions conduct their affairs in a legal, safe and sound manner.").[8] Thus, the legislative history and judicial construction of the 1978 amendment as expressed in the *Marshfield* and *Otero* decisions does not support the Comptroller's conclusion that cease and desist authority gives him (the Comptroller) the power to impose personal liability.

It should be noted that the 1978 Senate Report specifically discusses and recites the very limited situation, "where an insider has unjustly enriched himself at the expense of the institution, the [Comptroller] may find it more effective to take action directly against the individual for return of property rightfully belonging to the institution." Senate Rep. No. 95–323, 95th Cong., 1st Sess. 7 (1977). The Comptroller attempts to expand this single excerpted sentence from the lengthy Senate Report (referring to administrative action for the return of bank property, and limited to the fact situation of unjust enrichment) into a broad, sweeping mandate of power to allow him to impose personal damages upon directors by arguing that Congress intended that the Comptroller have "a broad range of corrective remedies to protect the health of the national banks...." Comptroller's br. at 5. We are at a loss to understand how the Comptroller can even attempt to interpret this one phrase in the Senate Report as providing the authority to impose personal damages in the instant case, where there is absolutely no proof of personal enrichment. As previously noted in this opinion, 12 U.S.C. § 1818 originally was enacted to give the Comptroller the authority to deal with new enforcement problems facing the banking industry that could not be effectively addressed under the then existing laws and statutes. The amendment to 12 U.S.C. § 1818 in 1978 merely extended this power, allowing the Comptroller to bring an action against individual directors, officers and employees who were engaging in an unsafe and unsound banking practice or violating a bank-

---

8. The Comptroller, just as a bank or bank shareholder seeking to recover losses from directors inflicted on the bank due to the approval of excess loans in violation of 12 U.S.C. § 84, must bring his action against a director or directors in federal district court. *See Corsicana National Bank v. Johnson*, 251 U.S. 68, 40 S.Ct. 82, 64 L.Ed. 141 (1919); note 4, *supra.*

ing law or regulation. In granting the federal banking regulatory agencies this limited authority, we are convinced that Congress never intended to give these agencies a "blank check" authority. Rather, as Congress very clearly and succinctly stated when it enacted 12 U.S.C. § 1818(b)(1) in 1966, "the administration's request for additional and effective supervisory powers should be granted, *within carefully guarded limits,* in order to make sure that our banks and savings and loan associations would continue to serve the Nation effectively and well." S.Rep. No. 1482 84th Cong., 2d Sess., *reprinted in* [1966] U.S.Code & Ad.News 3532, 3538. The Comptroller, from the time 12 U.S.C. § 93 was enacted in 1864 to 1966 when 12 U.S.C. § 1818 was enacted and until section 1818(b)(1)'s amendment in 1978, exclusively brought his actions seeking to impose personal liability on directors and officers in the "proper district or territorial court" under 12 U.S.C. § 93(a). Thus, given the legislative history reciting the circumstances leading to the enactment of 12 U.S.C. § 1818, if Congress had intended to alter or change the enforcement scheme or procedure mandating that the Comptroller bring such actions in district court, Congress would have explicitly provided this authority as it did in 1978 when it provided the Comptroller with the authority to order a director, officer or employee to cease and desist from engaging in an unsound and unsafe banking practice or violating a banking law or regulation. Further, the very same page of the Senate Report that the Comptroller cites referring to situations involving "unjust enrichment" also states, "[i]t will be expected that this authority [to issue cease and desist orders] will be utilized only in those cases where adequate relief cannot otherwise be obtained." *Id.* Congress has provided the mechanism and legislated that personal liability may be assessed against an individual director only after the rendering of a final judgment in the *"proper district or Territorial court,"* 12 U.S.C. § 93(a), and thus, section 93 prescribes the specific procedure for the Comptroller to recover damages.

Further, the enforcement scheme of 12 U.S.C. § 93 clearly indicates Congress intended that an action seeking personal liability for violations of the banking laws only be brought under 12 U.S.C. § 93(a) in federal district court and not under 12 U.S.C. § 1818(b)(1), that allows the Comptroller, pursuant to his cease and desist authority, to take "affirmative action" to correct unsound and unsafe banking practices or violations of the banking laws. It is a "well-established canon of construction that a single provision [in this case, 12 U.S.C. § 1818(b)(1) ] will not be interpreted so as to defeat the general purpose that animates and informs a particular legislative scheme. We ... attribute to [Congress] a general overriding intent to avoid results that would undermine or vitiate the purposes of specific provisions." *Milwaukee County v. Donovan,* 771 F.2d 983, 986 (7th Cir.1985) (citations omitted). Consequently, "when courts are confronted with statutes 'capable of coexistence, it is the duty of the courts, absent a clearly expressed Congressional intention to the contrary, to regard each as effective.'" *FAA Administrator v. Robertson,* 422 U.S. 255, 266, 95 S.Ct. 2140, 2147, 45 L.Ed.2d 164 (1975) (quoting *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 133–34, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974)). In 1978, when Congress amended section 1818(b)(1) allowing the Comptroller to bring an action against bank directors, officers and employees (who until this point could not be reached under § 1818(b)(1)) it neither rescinded, amended nor limited 12 U.S.C. § 93(a) requiring that suits for damages against individual directors be "determined and adjudged by a proper district or Territorial court." "Congress is presumed to know its own laws," *United States v. Hawkins,* 228 F.2d 517, 519 (9th Cir.1955); *see also Cannon v. University of Chicago,* 441 U.S. 677, 696–97, 99 S.Ct. 1946, 1957–58, 60 L.Ed.2d 560 (1979); *Martin v. Luther,* 689 F.2d 109, 115 (7th Cir.1982), and in fact, when Congress amended 12 U.S.C. § 1818(b)(1) to allow the Comptroller to bring an action against individual bank di-

rectors and officers in a limited manner, it also amended 12 U.S.C. § 93 in the same law, Pub.L. 630, adding a subsection (b) to that statute providing only for the imposition of civil penalties upon violators of federal banking statutes. Under this enforcement scheme, the Comptroller may impose civil penalties upon officers and directors for violations of the banking laws; the penalty may be reviewed in an administrative hearing and by appeal to a United States Circuit Court of Appeals "in which the home office of the bank is located...." 12 U.S.C. § 93(b)(3)(4) (1978).[9] In enacting Pub.L. 630, that created 12 U.S.C. § 93(b), Congress was well aware of the new statutory powers it was creating and clearly did not give the Comptroller the authority to impose personal liability under 12 U.S.C. § 1818(b)(1). When Congress provided a specific administrative remedy for assessment of civil penalties, it is only logical that Congress would have also explicitly provided for an administrative procedure for assessing personal liability if it intended that the Comptroller have this authority. The Comptroller, reaching for any "straw in the wind" to support his position, argues that section 93 merely gives him an option either to bring an action in federal court or to commence an administrative proceeding. This is a great theory, but there is no such language in the statute providing for this "option;" had Congress intended to provide this "option" to the Comptroller, it would have stated so in explicit language, as it did in 1978 when it amended the statute to allow the Comptroller to bring an action against a director ordering him to cease and desist from engaging in unsafe banking practices or from violating banking laws. From our review of the federal banking laws and decisions we are unable to discover any authority upholding this self-proclaimed assumption of power, and if we were to adopt the Comptroller's argument we would effectively eviscerate section 93(a).

Our research has revealed but two cases interpreting the authority of the Comptroller pursuant to 12 U.S.C. § 1818(b)(1) to impose personal liability upon bank directors. In *First National Bank of Eden v. Dept. of Treasury*, 568 F.2d 610 (8th Cir.1978), the Comptroller issued an order to cease and desist requiring, *inter alia*, that the president and vice-president of a bank reimburse $61,000 in bonuses paid to them. The bank challenged the validity of the order to reimburse the $61,000. The court, without providing any reasoning, much less statutory authority or case law, merely recited the language of 12 U.S.C. § 1818(b)(1) and rubberstamped the decision of the Comptroller, noting "[t]he requirements imposed in the order are authorized by the statute." *Id.* at 611. The order in *Eden* was in the nature of an order of restitution, rather than damages, to recover bonuses traced to the bank's president and vice-president who had unjustly enriched themselves. Because *Eden* involved a situation where it was clear that the bank employees had unjustly enriched themselves, the action of the Comptroller ordering restitution might very well be sustained and read as having conceivably been contemplated by Congress as revealed in the narrow language of the Senate Report.[10] But to expand that single, passing reference in the Senate Report referring to the recovery of bank funds from bank directors who personally enriched themselves at the bank's expense to the facts of this case, where there is no evidence whatsoever of any personal enrichment, falls of it-

---

**9.** The Federal Reserve Board statutory authority to assess personal damages and civil remedies is similar to 12 U.S.C. § 93(a)(b). *See* 12 U.S.C. § 503, 504.

**10.** The decision does not recite that the bank officers in *Eden* ever asserted their right to have a court determine the right of the Comptroller to impose personal liability upon them for the alleged granting of excessive bonuses, and consequently the *Eden* court did not even address this issue. Thus, the Comptroller's attempt to expand the holding in *Eden* in support of the proposition that 12 U.S.C. § 1818 provides the Comptroller with some type of majestic authority to impose personal liability upon a director without an adjudication in a United States court of competent jurisdiction is improper and inaccurate.

self on a foundation of quicksand, without any case law or statutory authority to support the same. In *del Junco v. Conover*, 682 F.2d 1338 (9th Cir.1982), *cert. denied*, 459 U.S. 1146, 103 S.Ct. 786, 74 L.Ed.2d 993 (1983), the court upheld an order to directors to indemnify the bank for losses resulting from illegal loans (similar to the case at bar), but again failed to address or analyze the authority of the Comptroller to unilaterally impose personal liability. Thus, to date, no court has analyzed, much less set forth, any rationale that would support the alleged and usurped authority of the Comptroller of the Currency to issue an order imposing personal liability upon directors.[11]

The Comptroller finally argues that support for the proposition that the language "affirmative action" contained in 12 U.S.C. § 1818(b)(1) includes assessment of personal damages from bank directors is found in cases construing an "analogous statute," the National Labor Relations Act ("NLRA"). Specifically, the Comptroller notes that the NLRA authorizes the National Labor Relations Board ("NLRB") to order persons who engage in unfair labor practices to "cease and desist" and "to take affirmative action including reinstatement of employees with or without backpay, as will effectuate the policies of this subchapter." 29 U.S.C. § 160(c). This same argument was advanced by the Comptroller and rejected by the Tenth Circuit in *Otero Sav. & Loan Ass'n v. Federal Home Loan Bank*, 665 F.2d 279, 287, 291 (10th Cir. 1985) ((Holloway, J.) (Cogan, J., dissenting)). In *Otero*, the Tenth Circuit interpreted the language of 12 U.S.C. 1730(b),

which is identical to 12 U.S.C. § 1818(b)(1), and concluded that "[i]n light of the wording and legislative history of the statute involved here, the Bank Board's powers appear more limited [than the powers of the NLRB]." *Id.* at 287. Indeed, the National Labor Relations Act explicitly and specifically provides for an award of backpay, thus evincing a clear Congressional intent that the Board have the authority to assess money damages against those parties adjudged as being in violation of the Act. Such legislative evidence of clear Congressional intent is noticeably lacking in the position relied upon by the Comptroller that 12 U.S.C. § 1818 gives him the authority to impose personal liability upon bank directors. Had Congress desired that the Comptroller have the authority to impose personal liability, it would have enacted legislation granting him such power.

With the enactment of 12 U.S.C. § 93(a), it is obvious that Congress intended that "[i]f the directors of any national banking association shall knowingly violate ... any of the provisions of this chapter, all of the rights, privileges, and franchises of the association shall be thereby forfeited. Such violation shall ... be determined and adjudged by a proper district or Territorial court of the United States in a suit brought for that purpose by the Comptroller of the currency...." Thus, bank directors are to be adjudged personally liable only after receiving all the constitutional and legal protections accorded every citizen in a trial in a United States District Court. These protections would effectively be abolished and the clear intent of section 93 would be cast aside if 12 U.S.C. § 1818(b)(1) were to

11. The Comptroller also cites *Independent Bankers Ass'n v. Heimann*, 613 F.2d 1164, 1168–79 (D.C.Cir.1979) and *Groos Nat. Bank v. Comptroller*, 573 F.2d 889 (5th Cir.1978) for the proposition that the "corrective remedies available to the Comptroller is necessarily broad." While we agree that the Comptroller may exercise discretion in fashioning an appropriate remedy for the improvement of banking procedures, this power does not extend to the imposition of personal liability where 12 U.S.C. § 93(a) provides the appropriate method in which to seek such relief. Further, the cases cited by the Comptroller cannot reasonably be read to support extending his power to the imposition of personal damages. *Independent Bankers Ass'n* dealt with the Comptroller's authority to promulgate rules defining "unsafe and unsound" banking practices under 12 U.S.C. § 1818(b)(1). *Groos National Bank* involved a cease and desist order issued pursuant to section 1818(b)(1) prohibiting a bank from making further loans in violation of a previous agreement with the Comptroller. Neither case addressed the issue of whether the Comptroller has the authority to impose personal liability upon a bank director for violations of the banking laws.

be interpreted as granting the Comptroller the authority to act as prosecutor, judge, and jury and unilaterally issue an order to an individual director to indemnify the bank. Indeed, as noted in footnote 5, *supra*, when 12 U.S.C. § 1818(b)(1) was enacted Congress did not give the Comptroller the authority to remove directors since *"[t]he problems involved in delegating the vital quasi-judicial function of ... removing directors ... to a single official ... gave the committee much concern "*;[12] and in fact it was not until 1978 when Congress amended the statute that it gave the Comptroller the authority to remove a director, officer or employee.

As the Supreme Court recently stated in *Block v. Community Nutrition Institute,* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984):

> "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved."

*Id.* at 2454. Our review of the express language of 12 U.S.C. § 93 and 12 U.S.C. § 1818(b)(1), their statutory scheme and the Senate Reports, clearly demonstrate that Congress intended the Comptroller only be allowed to seek damages from an individual director after a suit has been filed and adjudicated in the "proper territorial or district court" pursuant to 12 U.S.C. § 93(a). The powers granted the Comptroller pursuant to section 1818 may be properly exercised only to correct illegal and/or unsafe and unsound banking practices or violations of banking laws and regulations, including the removal of officers and directors, in order that he might protect the consumers, the investors in the bank and the institution itself from further deterioration. The Comptroller has somehow read into the enabling legislation allowing him to issue cease and desist orders, the alleged

authority to impose personal liability upon bank directors, without case law support or statutory authority in support thereof. The Comptroller exceeded the scope of his authority when he issued the order to the petitioners in this case imposing personal liability for violating 12 U.S.C. § 84. Should the Comptroller determine that he needs the authority to unilaterally impose personal liability to effectively fulfill his obligations and duties, without resort to a trial court where the director is provided with the Constitutional safeguards, it is incumbent upon him to ask Congress to pass such enabling legislation just as he did in 1966 when he proposed that 12 U.S.C. § 1818(b)(1) be enacted and in 1978 when this section was amended.

The order of the Comptroller imposing personal liability upon the bank directors is REVERSED and VACATED with costs awarded to petitioners for this appeal.

EASTERBROOK, Circuit Judge, concurring.

An agency that lacks the power to require something unconditionally may be able to elicit action by imposing conditions on the exercise of an admitted power. *Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 654–56, 98 S.Ct. 2053, 2066, 56 L.Ed.2d 591 (1978); *United States v. Chesapeake & Ohio R.R.,* 426 U.S. 500, 96 S.Ct. 2318, 49 L.Ed.2d 14 (1976); cf. *ICC v. American Trucking Associations, Inc.,* 467 U.S. 354, 364–71, 104 S.Ct. 2458, 2465, 81 L.Ed.2d 282 (1984). The court holds that the Comptroller may not directly require a director of a bank to make good any losses resulting from loans that exceed the bank's lending limit. The Comptroller has other powers, including the power to disapprove a person's membership on a bank's board of directors and the power to shut the bank. If a member of a board should approve an excessive loan, and if the bank's inability to collect should imperil the safety of the bank, the Comptroller

---

**12.** S.Rep.No. 1482, 89th Cong., 2d Sess., *reprinted in* 1966 U.S. Code Cong. & Ad. News 3532, 3539–40.

might seek to condition the exercise or withholding of some other power on the directors' willingness to make the bank whole. The Comptroller did not do this here. The order runs against Orville Bottrell, who is no longer a director of the Bank and therefore is not subject to conditions imposed on his continuing participation. More, at oral argument counsel for the Comptroller disclaimed any contention that repayment is necessary to maintain the Bank's soundness, or that the order to pay is a condition on the grant of some other permission or the withholding of another of the Comptroller's powers. Because we need not decide whether the Comptroller possesses any "conditioning power," I join the court's opinion.

BAUER, Circuit Judge, dissenting.

For the reasons stated in the majority opinion overturned by this *en banc* opinion, *Larimore v. Conover*, 775 F.2d 890 (7th Cir.1985), I respectfully dissent.