912 F.2d 1172
 Harold A. HOFFMAN, individually and as president, director
and participant in the conduct of the affairs of
Alaska Continental Bank, Anchorage,
Alaska, Petitioner,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, Respondent.
 No. 89-70466.
 United States Court of Appeals,
Ninth Circuit.
 Argued Aug. 8, 1990.
Submitted Aug. 10, 1990.
Decided Aug. 31, 1990.
As Amended Oct. 25, 1990.
 
 Keenan Powell, Weidner & Associates, Anchorage, Alaska, for petitioner.
 Robert S. Cessar, Federal Deposit Ins. Corp., Washington, D.C., for respondent.
 Petition to Review a Decision of the Federal Deposit Insurance Corporation.
 Before RONEY*, FARRIS, and FERNANDEZ, Circuit Judges.
 FERNANDEZ, Circuit Judge:
 
 
 1
 The Federal Deposit Insurance Corporation (FDIC) issued a cease and desist order on September 12, 1989, in which, among other things, it directed Harold A. Hoffman (Hoffman) to repay $61,796.48 that he had received from Alaska Continental Bank (ACB). Hoffman has petitioned for a review of that decision. We affirm the action of the FDIC and deny the petition.
 
 BACKGROUND FACTS
 
 2
 ACB commenced doing business in 1982 and by 1986 it began to encounter financial difficulties. Its troubles deepened, its losses continued to mount, and its non-earning assets increased. The Board of Directors (Board) and the president of the bank, Hoffman, were well aware of that, although they retained a rather optimistic outlook.
 
 
 3
 Despite optimism, the FDIC and state regulators conducted an examination of ACB in March of 1988, and by May of 1988 Hoffman was informed that the examiners considered the bank to be technically insolvent. Hoffman agreed with that assessment, and informed the Board of it. In a meeting later in May, the examiners and the FDIC Regional Director directly conveyed that information to the Board and said that the bank would be transferred to a "successful closed bank bidder." The Regional Director further told Hoffman and the rest of the Board that they were caretakers of ACB until closure and that their duty was to maintain the bank's assets so that it could be sold at as high a price as possible. The Board questioned the need for closure, and Hoffman said that an investor could be found to recapitalize and revive the bank.
 
 
 4
 Nevertheless, closure proceedings moved forward despite ACB's hiring of legal counsel in an attempt to delay a then almost inevitable denouement to the bank's story. Those attempts included reliance upon a Price Waterhouse audit conducted the previous December, which accepted management's judgment about the strength of the loan portfolio.
 
 
 5
 While ACB was thus going through its death throes, those whom the FDIC had told to be caretakers were not idle. Among other things, they decided that this was the time to set up a director's and officer's indemnity fund, because they had not been able to get insurance since 1986. They also decided, upon Hoffman's request, that they would purchase the balance of Hoffman's employment contract, because he had declared that he would resign as of June 10, 1988, although he did stay on board until actual closure. The cost of that buyout was $61,796.48.[1]
 
 
 6
 The FDIC was understandably concerned by these actions of people who, in its opinion, should have been preserving the assets of ACB during the short period before actual closure. FDIC rather thought that those people were, instead, bleeding off liquid assets for their own benefit.
 
 
 7
 The administrative proceedings followed and after a hearing before an ALJ the cease and desist order in question was ultimately issued by the FDIC.
 
 JURISDICTION AND STANDARD OF REVIEW
 
 8
 The FDIC had jurisdiction pursuant to 12 U.S.C. Sec. 1818(b)(1) and (h)(1), and we have jurisdiction to review its order. 12 U.S.C. Sec. 1818(h)(2).
 
 
 9
 We uphold administrative findings of the FDIC if they are supported by substantial evidence. 12 U.S.C. Sec. 1818(h)(2). See del Junco v. Conover, 682 F.2d 1338, 1340 (9th Cir.1982), cert. denied, 459 U.S. 1146, 103 S.Ct. 786, 74 L.Ed.2d 993 (1983). See also Sunshine State Bank v. Federal Deposit Ins. Corp., 783 F.2d 1580, 1583-84 (11th Cir.1986) (per curiam).
 
 
 10
 The FDIC has "broad discretion" to fashion a remedy. del Junco, 682 F.2d at 1340. As to constitutional questions, this court reviews findings of fact for clear error and mixed questions of law and fact de novo. State of Nevada Employees Ass'n Inc. v. Keating, 903 F.2d 1223, 1226 (9th Cir.1990).
 
 DISCUSSION
 
 11
 A. The Authority to Issue the Cease and Desist Order
 
 
 12
 Hoffman claims that the FDIC had no authority to order him to make restitution of the $61,796.48 payment he received for his contract. We disagree.
 
 
 13
 There can be no doubt that the FDIC has authority to issue a cease and desist order if it finds that an institution has engaged in an unsafe or unsound practice. 12 U.S.C. Sec. 1818(b)(1).
 
 
 14
 It has been said that an unsafe or unsound practice is one " 'which is contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would be abnormal risk or loss or damage to an institution, its shareholders, or the agencies administering the insurance funds' " and that it is a practice which has a "reasonably direct effect on an association's financial soundness." Gulf Fed. Sav. & Loan Ass'n v. Federal Home Loan Bank Bd., 651 F.2d 259, 264 (5th Cir.1981), cert. denied, 458 U.S. 1121, 102 S.Ct. 3509, 73 L.Ed.2d 1383 (1982). Self-dealing has been identified as an unsafe or unsound practice because of the conflict it creates between the interests of the institution and the interests of an individual. First National Bank of Lamarque v. Smith, 610 F.2d 1258, 1265 (5th Cir.1980); Independent Bankers Ass'n of America v. Heimann, 613 F.2d 1164, 1168 (D.C.Cir.1979), cert. denied, 449 U.S. 823, 101 S.Ct. 84, 66 L.Ed.2d 26 (1980). Those cases turn on the principle that breaches of fiduciary duty by bank officials are inherently dangerous and cannot be considered safe. Cf. Federal Sav. & Loan Ins. Corp. v. Molinaro, 889 F.2d 899, 903-04 (9th Cir.1989).
 
 
 15
 As the FDIC board pointed out, during a time when Hoffman and ACB's board knew that they were supposed to be acting as caretakers of a bank that was rapidly declining, they decided to divert some of its assets in a way that could not help but cause detriment to the shareholders and other creditors of the bank. Evidence before the ALJ and the FDIC indicated that Hoffman was cashed out because the bank was about to close. The terms were favorable to Hoffman; they amounted to prepayment of his salary to the end of his contract--December 2, 1988--although it was rather obvious that he would not be working that long. This would raise eyebrows under the best of circumstances; the FDIC properly determined that it was considerably more dubious under the circumstances of this case. Even if there are cases in which the FDIC and the courts should countenance the idea that a breach of fiduciary duty is not an unsafe or unsound practice, this is not one of those cases.[2]
 
 
 16
 But, says Hoffman, assuming there was an unsafe or unsound practice, the FDIC cannot order restitution. That does not comport with the law of this circuit.
 
 
 17
 In del Junco, 682 F.2d at 1341-43, we made it perfectly clear that the appropriate agency does have the authority to make restitution orders. In that case the directors had approved a loan that violated the loan to one borrower limitation on the bank. The agency ordered the directors to indemnify the bank, and thus to assume the risk of collection of that loan. We found that to be well within the agency's authority. del Junco dealt specifically with the Comptroller of the Currency, but the principles it enunciated apply equally to the FDIC. See also First Nat'l Bank of Eden v. Department of Treasury, 568 F.2d 610, 611 (8th Cir.1978) (per curiam) (bank officers can be directed to reimburse the bank for excessive bonuses). We recognize that Larimore v. Comptroller of the Currency, 789 F.2d 1244 (7th Cir.1986) (en banc), upon which Hoffman heavily relies, does appear to disagree with this position. That case, however, does not state the law of this circuit; del Junco does.
 
 
 18
 Despite Hoffman's claims to the contrary, the result of this is not an adjudication of his ultimate rights. Whatever rights he might have are still available to him. The order simply means that he will not be permitted to rely upon his insider position and obtain a preference for himself, while bleeding off needed cash assets of the bank. Rather he will be treated like the fiduciary he was. He must surrender his special preferential payment and then stand in line with the other creditors of the bank. Not only is that direction well within the authority of the FDIC, but it is also equitable.
 
 B. Due Process
 
 19
 Hoffman asserts that he and ACB were deprived of due process at the hearing before the ALJ, because he was not permitted to contest the determination that ACB was, in fact, insolvent. The ALJ did not consider that to be relevant to the cease and desist hearing. We agree.
 
 
 20
 Hoffman's theory seems to be that if ACB were not really insolvent, he and the Board could not have known that it was insolvent. Thus, the argument goes, their actions could not have been unsafe or unsound and, surely, they could not have had any intention of doing wrong. Therefore, when he was not allowed to prove that ACB was not really insolvent, he was deprived of his right to a fair hearing.
 
 
 21
 There is some surface appeal to that argument, but it will not withstand an analysis that dips even slightly below the surface. The FDIC has the authority to issue a notice of charges if an insured institution has engaged or is engaging in an "unsafe or unsound" practice. 12 U.S.C. Sec. 1818(b)(1). If the FDIC finds an unsafe or unsound practice, then the FDIC may issue an order to cease and desist, whether the institution is insolvent or not.
 
 
 22
 Whatever else the Board and Hoffman chose to tell themselves, they could hardly doubt that ACB was in serious financial straits, that the regulators thought ACB's condition so serious that closure was coming in a matter of weeks, and that they had been told to act as caretakers and preserve the bank's assets to the extent possible. Their activities during that period can hardly be viewed as anything but an attempt to preserve their own positions at the expense of the bank. Whether, as it ultimately turned out, the bank was insolvent or not, it was most apparent that its assets must be preserved. Given that, it was hardly prudent to decide that the best thing for ACB and its assets was to buy out Hoffman's contract, because he had decided to abandon a rapidly sinking ship.
 
 
 23
 In other words, the decision of the ALJ and the Board was quite right and they denied Hoffman no rights by refusing to entertain an attack upon the determination that insolvency actually existed. The FDIC found Hoffman's position to be disingenuous; that is a good characterization.[3]
 
 CONCLUSION
 
 24
 Hoffman generally claims that neither the evidence nor the law supports the cease and desist order. What we have said above demonstrates that he is simply not correct.
 
 
 25
 However one looks at this case, it is quite apparent that upon discovering the imminent demise of the bank, Hoffman and the Board took steps to enhance their own positions. Hoffman suggests that he actually helped the bank when he arranged an early buy out of his employment contract. That contention can hardly be taken seriously. The idea that bleeding an afflicted bank is beneficial to it is an attempt to resurrect at law a practice which the medical profession has happily abandoned.
 
 
 26
 The petition is DENIED; the decision is AFFIRMED.
 
 
 
 *
 Honorable Paul H. Roney, Senior Circuit Judge, United States Court of Appeals for the Eleventh Circuit, sitting by designation
 
 
 [1]
 Hoffman's employment contract required him to give six months notice if he desired to voluntarily terminate his contract with the bank. He was, of course, to receive compensation for his services rendered during that six month period. If the Board wished to have him leave before the six months ran out, it still had to provide him with up to six months pay, but should he obtain another job that obligation would end. In case the Board involuntarily terminated him, he could receive up to twelve months pay, depending upon the time left in his contract and the reasons for the termination
 
 
 [2]
 Hoffman also claims that the evidence must support a finding of scienter before an order can issue. We need not, and do not, decide whether there is any such requirement. Even if there is, it was met here. See del Junco, 682 F.2d at 1342
 
 
 [3]
 There is some suggestion in Hoffman's brief that he also claims that due process was violated because there was no preclosure hearing. That simply is incorrect. No preclosure hearing is required under these circumstances. See Fuentes v. Shevin, 407 U.S. 67, 92 n. 26, 92 S.Ct. 1983, 2000, n. 26, 32 L.Ed.2d 556 (1972); Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947)